BRYAN v. SIMS. See Case No. 18,028.

---

## Case No. 2,066a.

### BRYAN et al. v. STEVENS.

[1 Betts, C. C. MS. 30.]

Circuit Court. S. D. New York. June 2, 1841.

PATENTS—FRICTION MATCHES—SPECIFICATION—INFRINGEMENT—"EARTHY MATERIAL"—VALIDITY—TRIAL AT LAW.

[1. Trustees of a license to use a patent within specified territory may sue to restrain infringement within such territory without joining the cestuis que trust.]

[2. The specification of the Philips patent of 1836, for an improvement in friction matches, is sufficiently definite and certain, and the claim is not too broad to support the patent. Following Ryan v. Goodwin, Case No. 12,186.]

[3. The import of the summary of a specification is to be determined by reference to the specification as a whole.]

[4. Carbonate of lead is an "earthy material;" consequently, its use with phosphorus in the formation of a composition for the heads of friction matches is an infringement of a patent for the use in such connection of "a paste or composition" consisting of phosphorus and "earthy material," with the addition of a glutinous substance for the purpose of cohesion.]

[5. Where testimony is strongly conflicting as to questions of priority of invention, of public use, and of the title of persons claiming ownership of the patent, a court of equity, while it would pass on the questions if standing alone, will, where there are other questions which of necessity must go to a jury, direct all such questions to be disposed of by a trial at law.]

[6. In such a case, the court will not enjoin the defendant, nor compel him to give security to indemnify complainants in case of their ultimate success, nor to file periodic accounts of manufactures pending the litigation, until satisfied by a verdict at law that the patent is valid, and that complainants have a legal right to it.]

[In equity. Bill by Ezekiel Bryan (Byam), —— Whitney, and Seth King against John A. Stevens to restrain an alleged infringement of letters patent No. 68, granted to Alonzo D. Philips, October 24th, 1836, for an improvement in friction matches. The court reserved decision until the rendition of a verdict at law upon the validity of the patent and other matters.]

PER CURIAM. Alonzo D. Philips obtained a patent for the manufacture of friction matches, on the 24th of October, 1836. Philips on the 28th July, 1838, assigned his patent to Bryan, one of the plaintiffs, and by mesne conveyances, the entire interest of Bryan became vested in himself, and the other plaintiffs in trust for the "American Patent Friction Match Company." The patent interest had been formed into a joint stock company composed of 1,080 shares, estimated at $25 per share, and the shares were distributed amongst and held by a large number of proprietors. Previous to the assignment in July, 1838, Philips, the patentee, had made five different conveyances of interests under his patent to individuals of the following tenor, to wit (copy of conveyance not set forth), one of which was to Damar & Cronk. The plaintiffs, after acquiring the assignment, procured a transfer or assignment to them, also, of those conveyances, except that in respect to the one to Damar & Cronk, they obtained the release or assignment of Damar alone, and no account was given of Cronk, the other party thereto, or of any disposition of his interests.

The first question raised had relation to the competency and sufficiency of the parties complainants. It was contended for the defendant that the plaintiffs could not maintain the action in their own names alone, but that all the joint associates must unite in the suit, both the legal and equitable interest in the patent being vested in the associates or co-partners, and the complainants being no more than their agents or attorneys, and from this that if it was competent for the plaintiffs to represent the interests of their cestui que trusts, yet that there remained in Cronk an outstanding interest in the patent which barred any prosecution in which he was not a party. Under the act of 1793, § 4, no action could be brought for a violation of a patent right but in the names of parties having the entire patent interest. Tyler v. Tuel, 6 Cranch [10 U. S.] 324; Whittemore v. Cutter [Case No. 17,600]. The 16th section of the act of 1836 [5 Stat. 123] has extended the right of action to a party having an exclusive right within and throughout a specified part of the United States. This is effectually the spirit of the former act, because the grantee for a particular territory under a patent stands in the place of the inventor, and is clothed with his entire interest in the invention in respect to such limits, and is most properly authorized to vindicate his exclusive right and property by actions in his own name. If the several conveyances executed by Philips are to be regarded as grants in the acceptation of the statutes, then the unextinguished right of Cronk would bar the action of the plaintiffs because it is co-extensive with the United States, and the act of 1836 gives no separable actions to parties claiming interests within the same territorial limits. But these conveyances are not entitled to the character of grants or assignments of the patent right. A full assignment of the patent interest to parties reserving a few specified districts was construed by Judge Story to be no more than a license to the grantees. Tyler v. Tuel, 6 Cranch [10 U. S.] 324, as explained 1 Gall. 431 [Whittemore v. Cutter, Case No. 17,600]. A patent right being unsusceptible of local subdivision, an absolute grant of that character could operate only as a covenant or

license for the case of the patent right in the places designated. These instruments do not in terms make such assignment, and the defendant implies such operation for them because the interest acquired by the grantee is co-extensive territorially with the right of the patentee. This interest, however, is manifestly not a right to or in the patent. It is but a privilege under the patent. One also so limited and qualified as to denote that the parties were intended to have only a special privilege or license. Having no direct and absolute property in this patent, these parties could maintain no action for its infringement in their own names, nor need they be united with those having titles and who sue for a violation of it.

The objection to the parties most seriously urged is that the complainants have not the entire interest in the subject matter, and cannot therefore maintain the action without joining their co-partners or associates. The rule in respect to the joinder or non joinder of parties is administered in chancery practice with regard to the essential interests in litigation, and is accordingly more flexible than that prevailing at law; and moreover admits of modifications of the terms in which it is laid down, when the convenience of the case requires it, or the substance can be secured without adhering to the formalities usually exacted. [Thomas v. Brockenbrough] 10 Wheat. [23 U. S.] 146; [Elmendorf v. Taylor] Id. 167. The mere statement of the principle that all persons materially interested either legally or beneficially in the subject matter of a suit are to be made parties to it, affords no exact criterion, for it is administered under trains of exceptions which render the particular requirements of the rule of little practical avail. The cases are collected and stated by Judge Story with his usual fullness and perspicuity in the 4th and 8th chapters of his 3d volume, Equity Commentaries. And it seems to me that if there be a degree of ambiguity or uncertainty in chancery practice upon this head, yet the principle is fully sanctioned that whenever the legal estate or the right of absolute disposition thereof is vested in parties, they are competent to sustain or defer actions in relation thereto, without having parties interested in the trust or in the ulterior disposition of the estates brought before the court. Mitf. Pr. 175, 176; Greenleaf v. Queen, 1 Pet. [26 U. S.] 138. If then the complainants are regarded merely as trustees, still as the entire estate is vested in them, they have sufficient authority to prosecute actions vindicating that title without bringing into the pleadings all parties who may ultimately be affected by the decision.

There is, however, another principle applicable to this class, which perhaps more fully sanctions the right of these complainants to sue in their own names, than the general doctrine governing suits by trustees, which is, that when numerous parties form a voluntary association for public or private purposes, those who represent the rights and interests of the whole may maintain suits in equity in their own names in relation to the rights of the association. West v. Randall [Case No. 17,424]; Mandeville v. Riggs, 2 Pet. [27 U. S.] 487; Hopkirk v. Page [Case No. 6,697]. The bill in this case fulfills the condition decreed in the recognition of this suit, that this suit should purport to be for the benefit of all others interested equally with that of the plaintiffs. I think therefore that the parties plaintiff are competent to prosecute these actions, without bringing upon the record all who may have an interest in the assignment of the patent held by them, and that if the defendant can be allowed to raise the objection of want of parties without pleading or demurring to the bill, it must be overruled as insufficient to defeat or delay the action.

The just stress of the litigation has been upon the question whether the grant in the patent is sufficient upon the face of it, and whether the defendant has assigned it. The defendant contends that the patent is defective in two cardinal particulars: 1. The want of precision and certainty as to the subject matter of the grant; and 2, that it comprehends more than this discovery of the patentee; 3, it is further objected that plaintiff can claim no more than is specially set forth in the specifications, and he also insists that if the patent be valid he has not violated it. The two first discussed so largely between the counsel I consider determined by the decision of the circuit court of the first circuit on this patent. Ryan v. Goodwin [Case No. 12,186]. Exceptions in that case were taken to the validity of the patent for the causes here assigned, and the court on a careful consideration of the subject decided that the specification was sufficiently certain and definite, and that the claim was not too broad to support the patent. I shall adopt that decision as settling these points for the present, and proceed to consider the remaining questions in this case, whether the plaintiff can include within the patent any matter not specifically mentioned in the claim, and whether the manufacture of the defendant infringes the right of the plaintiffs under the patent. In recognizing the general validity of the patent, Judge Story limits his decisions to the case as then presented, which was that of the use by the defendant of chalk, one of the ingredients specifically mentioned in the specification, and waives discussing the point, whether the suggestion that other ingredients of a kindred nature would avoid the patent in toto. 3 Sumn. 522 [Ryan v. Goodwin, Case No. 12,186]. That point is now distinctly presented for consideration and discussion, involving necessarily the additional enquiry whether the patentee can thus claim the exclusive use of other ingredients.

The extent of the claim justified by the patent is first to be discussed. The defendant's counsel insists that the operation of the patent is to be limited to the claim of those materials designated in the summary, and that the language of the summary as putting forth the specific thing secured by the grant, is to be interpreted strictly. The patentee says "that I claim as my invention the using of a paste or composition to ignite by friction, consisting of phosphorous and earthy material, and a glutinous substance only, without the addition of chlorate of potash or any highly combustible material." And evidence has been produced from experts in the science of chemistry and from the books to show either that the description "earthy material" is too vague and indeterminate to designate any particular substance or class of substances known to the arts, or that if any are appropriately embraced within it, it necessarily excludes metals and their products. The plaintiffs contend that the import of the summary is to be determined by reference to the whole specification. This rule of interpretation is clearly sanctioned by Judge Story in the case alluded to, and such is the rule of exposition adopted in the English courts. Crosley v. Beverley, 1 Moody & M. 283; 3 Car. & P. 513; 1 Sumn. 485 [Ames v. Howard, Case No. 326]; Lowell v. Lewis [1 Mason, 182, Case No. 8,568]; Watt's Patent [Boulton v. Bull] 2 H. Bl. 463, 8 Durn. & E. [Term R.] 95. The invention is a new and useful improvement in the mode of manufacturing friction matches for the instantaneous production of light, consisting as he asserts of "a new composition of matter for producing ignition," and his specification discriminates his from the methods then known and in use by the introduction of a new ingredient, to wit, chalk or Spanish white, and the omission of chlorate of potash and any highly combustible materials. The mode of compounding is then given as used by the inventor, which is simply mixing specified proportions of chalk, phosporous, and gum arabic or glue, which in the claiming part is more specifically defined to be the using of a paste or composition consisting of phosphorous and earthy material and a glutinous substance only, without the addition of any highly combustible material, enumerating as such, chlorate of potash and sulphurate of antimony in combination with phosphorous. Reading the specification in connection with this claiming clause, the discovery that patentee supposes he has made appears to be set forth with sufficient perspicuity and certainty. It is to prepare the paste by omitting chlorate of potash and sulphurate of antimony and materials of a kindred character, and to substitute chalk, Spanish white or an earthy material in their places. The object and effect of this combination is clearly explained by the testimony. Potash and antimony are withdrawn to avoid the explosive and detonating properties produced by their union with phosphorous, and chalk is introduced to furnish a base sufficient to hold the phosphorous in combination and probably preserve it from deliquescing when exposed to the atmosphere. The end the patentee had in view being plainly indicated to provide materials free of inflammable properties which will retain the phosphorous in combination, and having specified those which contain that property and which he prefers, it seems to me the law will also secure to him the use of other substances having that same property, although he does not enumerate or distinguish them by any specific appellation. Take the cause of the supposed discovery in this case; one patents as his invention a composition of phosphorous with inflammable materials which will yield instantaneous combustion from friction, and states that he commonly uses chlorate of potash or sulphurate of antimony for that purpose, but that sulphurate of potash and chlorate of antimony and like chlorates and sulphurates will serve anyone the same purposes. It could scarcely be contended that such description could vitiate his patent because of the want of sufficient precision and exactness, nor but that the patentee could secure to himself the use of substances ejusdem generis with these enumerated. Crossley v. Beverly, 3 Car. & P. 513. The condition of such general claim is that it be found on experiment that the result asserted may be realized in the employment of the means or materials indicated. Turner v. Winter, 1 Durn. & E. [Term R.] 602–607.

The remaining consideration then is, whether the use of carbonate of lead by the defendant infringes the patent; that is to say, whether that be a substance ejusdem generis with those described and claimed by the patentee. All the witnesses agree in representing that carbonate of lime could be readily understood in the arts to be used by the patentee because of its absorbent property, and that earthy material named in the patent would be equally known to demand some substance of the same property. But it is by no means easy to determine upon the testimony of the many highly scientific and experienced witnesses exercised in the cause if there be any, and if so, what is the accepted and fixed import of the earthy material. It would be of no use here to collect or analyze the statements of those witnesses. A careful consideration of their testimony and of the various works on chemistry applicable to the arts which were referred to in the argument, however, impresses upon my mind this general result that if carbonate of lead is not correctly placed in class of earthy materials, the distinction between it and carbonate of lime in this respect is more matter of terms than of substance. Neither is an earth, and if either comes within the denomination of earthy material it can justly be so either be-

cause derived from the earth or because it is produced from that transmutation or state of the base which is recognized as an earth. Lime has become in the nomenclature of chemistry ranked as a primitive earth, still upon the proofs in this case and upon the testimony of books of science, its base is shown to be metallic. 1 * * * Chemistry, 359. Its derivations should carry with them the individuality which marks their origin. The carbonates of lime, whether produced mechanically or found in a native state, are salts (Webster's Chemistry, * * * 103, 104, 350, 361; 1 * * * Chemistry, 318–320); under this class also fall the carbonates of lead (Mis. Dict. of Chem. on Lead-Carbonates); and it is to be further borne in mind that if practically a greater familiarity has grown up with carbonates of lead produced directly from the metal, yet it, as well as that of lime, is found in a native state, and in quantities and condition fitting it for merchandise and use in the arts (* * * Mineralogy, 635, 636; Webster's Chemistry (Ed. 1839) p. 352; Davies' Mineralogy, 226). It would hardly be controverted if the specification had claimed the discovery of carbonate of lime or any earthy material as the important ingredient of the mixture, stating that the patentee used quick lime produced from calcium, but that chalk would be contained within the specification. It could be comprehended either because it exists in a natural state in the earth or that it exhibits the properties sought for in the carbonate of lime. Would not the same reasons apply to carbonates of lead? It presents the absorbent property demanded, and if obtained directly from the earth would be in common parlance if not in strict scientific language an earthy material. Most of the carbonates exist within and are compounds of carbonic acid with salifiable bases, which are earths and metallic oxyds; and without having the affinities noted by the chemical writers, it is now pertinent in this case, to remember that almost the whole of the evidence drawn from the scientific witnesses examined upon this point demonstrates that metallic oxyds supply the received idea of earths if they are not the only substance known to chemistry or the arts entitled to that appellation. Earth is originally defined to be a metallic oxyd. It would seem to me that it would be giving no other than the fair and natural signification to the language of this specification to say that it included the carbonate of lead, and that it would indicate to a practical chemist most distinctly the use of that carbonate for the like purpose and with the same effect as the carbonate of lime, leaving to actual experiment to determine which might be employed most advantageously. I am accordingly prepared to say that the manufacture of the defendant is an infringement of the patent in this case.

This opinion has thus far proceeded upon the consideration of the patent as to its time, interpretation, and scope. Both parties desired the judgment of the court upon this point. This decision does not however remove other difficulties presented in the case, and which must, in this court, prevent a decree affirming the full rights of the complainants and securing to them the remedy they seek here. Various questions of facts were raised upon the hearing, some of which, from their nature and the character of the testimony introduced upon both sides, belong more appropriately to a court of law and a jury than to this court in its chancery capacity; and others, though if standing singly might properly enough be disposed of by an equity judge as not differing from the range of facts exercised or decided in such courts in the exercise of their ordinary jurisdiction, yet as being presented in company with this, which this court ought not to hear and determine, will more fitly be referred with their associates to a legal tribunal. The open questions of fact which this court does not now adjudicate upon are these: 1. Whether the patentee is the original discoverer of the subject matter of his patent. The testimony is exceedingly strong that all the particulars secured by his patent were known and in use before it issued on his application for it. This testimony is however assailed by directly impeaching some of the witnesses in material facts and by cross evidence calculated to place their integrity or memory in doubt. The credibility of the various witnesses and the verity of their allegations can be more satisfactorily examined and settled in a trial at law, than on a hearing in equity and it is in character with the structure and purpose of our judicial system that matters of this description should be determined by a jury. 2. Whether the patentee had not publicly put upon sale matches manufactured after his method before he applied for the patent. 3. Whether the patentee conveyed bona fide on the 23d October, 1837, his whole patent right to Daniel M. Chapin, and whether, when the assignment now held by the complainants was obtained by Bryan on the 28th July, 1838, he knew of such prior conveyance. The evidence presented bearing upon these inquiries is strongly conflicting. The court might not have deemed it necessary to defer judgment to have this point, if it stood alone, disposed of by a trial at law, but as the others must be submitted to a jury it is regarded as more satisfactory and appropriate to have this investigated and settled there also. The usual practice of this court has been when the right of a patentee is brought in question, not to give him the benefit of its equity jurisdiction until the validity of the patent is determined at law. The defendant is frequently required to enter into bonds to file periodically accounts of his manufacture, etc., and ultimately to pay what may be decreed against him, and if

he does that, it has never been the usage of this court to enjoin his continuing what is alleged to be a violation of the patent. These bonds are not executed unless the prima facie evidence on the part of the complainant presents a strong case of right upon his side and wrong on that of the defendant: the defendant claiming the privilege to make it appear on trial that the complainant cannot maintain the right set up. When the proofs on the part of the defendant clearly overthrow the right, and the matter to be tried is, in effect, whether the complainant can displace or countervail such evidence, the reason of the practice fails, and it would strike me as eminently unjust to place the defendant under any restrictions in his business, or even to exact an account from him unless it is made to appear that such account will be indispensable evidence for the plaintiff in case of his final success. The assignees and not the patentee have sued. The proof is full and positive that the assignment was obtained for a trifling consideration with notice of a previous one, and Bryan on receiving such notice asserting that he did not regard the prior assignment because it had not been recorded. There has been a suit at law in the first circuit at Boston [Ryan v. Goodwin, Case No. 12,186], and also one in equity at Rhode Island [1] upon this patent. Neither action however raised or disposed of the questions now presented, and cannot be regarded as fulfilling the rule that an injunction will be granted when the validity of the patent has been settled by a trial at law. This is so if those actions are regarded as advisory in all respects, instituted and conducted with intent to test the right, and not, as urged here by the defendants, of an amicable character contested pro forma.

The court in this case is therefore led to the conclusion not to interpose by injunction or order until satisfied by a verdict at law that the patent is valid, and that the plaintiffs have a legal title to it. The simple and usual method is to order proceedings in equity to stay until such matter is ascertained by a trial at law, leaving it to the plaintiff to bring his actions and coerce the trial with such speed as may be commended. The suggestion is, however, made in the present case, that it will be more convenient to the parties if the court will direct issues at law and order them to trial on the law side, as in that way, the present judgment of the court upon the points of law will be the law of that trial. I do not find any of the circuit courts have promulgated such practice as used in patent cases. I am not disposed to question the competency of this court to direct such issues, but as there is in fact a case at law pending between these parties in this circuit, it does not seem to me proper to introduce a new

practice on this occasion, and it will accordingly be left to the parties to determine by stipulation between themselves, whether the suit now pending shall be tried, or issues be framed conformably to this decision and be submitted to the jury, and the verdict be returned into the equity side of this court, as ground for the final action of this court.

[NOTE. Patent No. 68 was granted to A. D. Philips, October 24, 1836. For other cases involving this patent, see Byam v. Farr. Case No. 2,264; Byam v. Eddy, Id. 2,263; Ryan v. Goodwin, Id. 12,186; Brooks v. Byam, Id. 1,948; Byam v. Bullard, Id. 2,262.]